UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,               )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )
REAL PROPERTY LOCATED AT                )
80 ASHTON DRIVE,                        )
BURR RIDGE, IL 60527                    )
                                        )
REAL PROPERTY LOCATED AT                )
102 ASHTON DRIVE,                       )
BURR RIDGE, IL  60527                   )
                                        )
REAL PROPERTY LOCATED AT                )
9000 COUNTY LINE ROAD,                  )
BURR RIDGE, IL 60527                    )
                                        )
REAL PROPERTY LOCATED AT                )
16006 DONNA MARIE DRIVE,                )
HOMER GLEN, IL 60491                    )
                                        )
REAL PROPERTY LOCATED AT                )
629-645 E. 162ND STREET,                )
SOUTH HOLLAND, IL 60473                 )
                                        )
FUNDS IN THE AMOUNT OF                  )
$4,860,610.02 IN THE CUSTODY OF         )
THE UNITED STATES MARSHALS              )
SERVICE RELATED TO THE SALE             )
OF 2140 SOUTH MIAMI AVE, MIAMI,         )
FLORIDA, 33127                          )
                                        )
REAL PROPERTY LOCATED AT                )
5152-60 W. 127TH STREET                 )
ALSIP, IL 60803                         )
                                        )
FUNDS   IN   THE   AMOUNT   OF          )
$1,204,810.98 IN THE CUSTODY OF         )
THE  UNITED  STATES  MARSHALS

SERVICE RELATED TO THE SALE
OF 625 EAST US HIGHWAY 20,
MICHIGAN CITY, IN 46360

       Defendants.

## **VERIFIED COMPLAINT FOR FORFEITURE**

The UNITED STATES OF AMERICA, by ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, and LORINDA LARYEA, Acting Chief of the Fraud Section, Criminal Division, United States Department of Justice, for its verified complaint against the above-named defendant properties, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

### **Nature of the Action**

1.    This is a civil action brought to forfeit property for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2.    This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3.    This complaint is verified by the attached Verification of **Melissa Bayan**, Health and Human Services Office of the Inspector General ("HHS-OIG") Special Agent, which is fully incorporated herein.

4. This action is governed by the Federal Rules of Civil Procedure, specifically Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and Title 18, United States Code, Sections 983 and 985.

## The Defendant *in rem*

5. The defendant *in rem* consists of the following properties (collectively, the "**Subject Properties**"):

## Real Properties

a) 80 Ashton Drive, Burr Ridge, IL 60527 ("**Burr Ridge Property 1**") and legally described as:

> LOT 29 IN COUNTY LINE CREEK ESTATES, BEING A SUBDIVISION OF PART OF TFIE NORTHWEST 1/4 OF SECTION 1, TOWNSHIP 37 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED FERUARY 17, 1988 AS DOCUMENT R88-015677 AND CERTIFICATE OF CORRECTION RECORDED JANUARY 17, 1990 AS DOCUMENT R90-007471, IN DU PAGE COUNTY ILLINOIS. AND LOT 30 IN COUNTY LINE CREEK ESTATES, BEING A SUBDIVISION OF PART OF THE NORTEEAST 1/4 OF SECTION 1, TOWNSHIP 37 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED FERUARY 17, 1988 AS DOCUMENT R88-015677, IN DU PAGE COUNTY, ILLINOIS. PIN#: 10-01-207-075.

> The record owner of the defendant property is Emily Investments, LLC.

b) 102 Ashton Drive, Burr Ridge, IL 60527 ("**Burr Ridge Property 2**") and legally described as:

> LOT 28 IN COUNTY LINE CREEK ESTATES, BEING A SUBDIVISION OF PART OF THE NORTHEAST 1/4 OF SECTION 1, TOWNSHIP 37 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE.PLAT THEREOF RECORDED FERUARY 17, 1988 AS DOCUMENT R88-015677 AND CERTIFICATE OF CORRECTION RECORDED JANUARY

3

17; 1990 AS DOCUMENT R90-007471, IN DU PAGE COUNTY ILLINOIS. PIN#: 10-01-207-064.

The record owner of the defendant property is Emily Investments, LLC.

c) 9000 County Line Road, Burr Ridge, IL 60527 ("**Burr Ridge Property 3**") and legally described as:

THAT PART OF THE NORTHEAST 1/4 OF SECTION 1, TOWNSHIP 37 NORTH, RANGE 11 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHEAST CORNER OF LOT 32 IN COUNTY LINE CREEK ESTATES, RECORDED FEBRUARY 17, 1988 AS DOCUMENT R88-15677, IN DU PAGE COUNTY, ILLINOIS: THENCE SOUTH 00 DEGREES 09 MINUTES 18 SECONDS EAST 235.00 FEET ALONG A LINE THAT IS 40 FEET WESTERLY AND PARALLEL WITH THE EAST LINE OF SAID QUARTER SECTION; THENCE SOUTH 89 DEGREES 48 MINUTES 31 SECONDS WEST, 849.30 FEET ALONG A LINE THAT IS 235 FEET SOUTHERLY AND PARALLEL WITH THE SOUTH LINE OF LOTS 28, 30, 31 AND 32 IN SAID COUNTY LINE CREEK ESTATES TO THE EAST LINE OF LOT 21 IN SAID SUBDIVISION; THENCE NORTH 00 DEGREES 02 MINUTES 20 SECONDS EAST, 235.00 FEET ALONG SAID EAST LINE TO THE SOUTH LINE OF SAID LOT 28; THENCE NORTH 89 DEGREES 48 MINUTES 31 SECONDS EAST, 848.50 FEET ALONG THE SOUTH LINE OF SAID LOTS 28, 30, 31 AND 32 TO THE POINT OF BEGINNING, IN DU PAGE COUNTY, ILLINOIS. PIN#: 10-01-207-076.

The record owner of the defendant property is Emily Investments, LLC (**Burr Ridge Property 1, Burr Ridge Property 2,** and **Burr Ridge Property 3** are collectively referred to herein as the "**Burr Ridge Properties**").

d) 16006 Donna Marie Drive, Homer Glen, IL 60491 (the "**Homer Glen Property**") legally described as:

PARCEL 1: LOT 47 IN COUNTRY VIEW ESTATES SUBDIVISION, A SUBDIVISION OF PART OF THE EAST 1/2 OF THE NORTHWEST 1/4 OF SECTION 24, TOWNSHIP 36 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MAY 21,

4

1997, AS DOCUMENT NUMBER R97-42439, IN WILL COUNTY, ILLINOIS.

PARCEL 2: EASEMENT FOR INGRESS AND EGRESS FOR THE BENEFIT OF PARCEL 1 AS CREATED BY RESERVATION IN DEED FROM COLE TAYLOR BANK AS TRUSTEE UNDER TRUST NUMBER 81147 TO JOSEPH L. IMESCH, BISHOP OF THE ROMAN CATHOLIC DIOCESE OF JOLIET AS SUCCESSOR TRUSTEE UNDER THE PROVISIONS OF THE TRUST AGREEMENT DATED DECEMBER 31, 1949 AND KNOWN AS THE ROMAN CATHOLIC DIOCESE OF JOLIET TRUST DATED JANUARY 22, 1993 AND RECORDED JANUARY 6, 1993 AS DOCUMENT R93-6771 OVER THE FOLLOWING DESCRIBED LAND: THE SOUTH 66 FEET OF THE NORTH 579 FEET OF THE WEST 425 FEET OF THE EAST 1/2 OF THE NORTHWEST 1/4 OF SECTION 24, TOWNSHIP 36, NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN WILL COUNTY, ILLINOIS. PIN#: 16-05-24-106-011-0000.

The record owner of the defendant property is Anan Abdallah and Linda A. Elkoussa.

e) 629-645 E. 162nd Street, South Holland, IL 60473 (the "**South Holland Property**") legally described as:

THE NORTH 12 RODS OF THE EAST 1/2 OF THE EAST 15 ACRES OF THE WEST 1/2 OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF SECTION 22, TOWNSHIP 36 NORTH, 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS. PIN#: 29-22-201-046-0000

The record owner of the defendant property is Aventus Holdings and Investment Corp.

g) Funds in the amount of $4,860,610.02 in the custody of the United States Marshals Service related to the sale of 2140 South Miami Ave, Miami, Florida, 33127 (the "**Miami Funds**").

f) 5152-60 W. 127th, Alsip, IL 60803 (the "**Alsip Property**") and

legally described as:

PARCEL 1:

5

LOT 1, IN CONCEPTS, A SUBDIVISION OF LOT 4, IN HOLIDAY PARK SUBDIVISION, OF PART OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 28, TOWNSHIP 37 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS. PIN#: 24-28-400-058-0000.

The record owner of the defendant property is Alsip Rental Investments, LLC ("Alsip Rental").

h) Funds in the amount of $1,204,810.98 in the custody of the United States Marshals Service related to the sale of 625 East US Highway 20, Michigan City, IN 46360 (the "**Michigan City Funds**").

5. The **Miami Funds** were seized on or about June 7, 2024 (*see* 24 M 453), and the **Michigan City Funds** were seized on or about July 10, 2024 (*see* 24 M 454). These funds are currently in the custody of the United States Marshals Service.

## Jurisdiction and Venue

6. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

7. This Court has *in rem* jurisdiction over the defendant properties pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to the forfeiture occurred within the Northern District of Illinois.

8. Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Sections 1395(a) and (b) because it is the district where the forfeiture accrued and it is a district where the **Subject Properties** are found.

## Statutory Basis for Forfeiture

9. The defendant properties are subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A) and (C) as property

6

that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Section 1343 (wire fraud), and property involved in, and property traceable to property involved in, transactions in violation of Title 18, United States Code, Section 1957 (money laundering) (the "**Subject Offenses**").

## Specific Allegations

10.     From approximately March 2021, through approximately March 2022, JAMIL ELKOUSSA ("ELKOUSSA"), through his company, Meridian Medical Staffing ("Meridian"), fraudulently obtained Health Resources and Services Administration ("HRSA") funds through Laboratory A, a laboratory located in Hillside, Illinois.  Absent the false information about COVID-19 PCR specimens that ELKOUSSA provided to Laboratory A, which Laboratory A then submitted to HRSA, HRSA would not have paid Laboratory A, through which ELKOUSSA received approximately $60.3 million in fraudulently obtained funds.

11.     Meridian ran multiple purported COVID-19 test collection sites ("Meridian Collection Sites") in Illinois and Florida, where COVID-19 test samples were purportedly collected from patients and transported to Laboratory A for processing and billing to HRSA. Laboratory A then submitted approximately $233 million in claims, via interstate wire transmissions through servers located outside of Illinois, for reimbursement to HRSA based on the false information that Meridian provided to Laboratory A, for which HRSA paid Laboratory A approximately $154 million.

7

12. Between approximately March 2021 and March 2022, Meridian received approximately $64.3 million in total inflows. Of those inflows, Laboratory A paid Meridian approximately $60.3 million between March 2021 and March 2022 due to the false testing information that ELKOUSSA provided, or caused to be provided, to Laboratory A through Meridian. Approximately 94% of the deposits Meridian received were therefore fraudulent funds that ELKOUSSA obtained from HRSA through Laboratory A.

13. After receiving this $60.3 million in Fraud Proceeds (the "Fraud Proceeds"), ELKOUSSA used the Fraud Proceeds to purchase the **Subject Properties**, as well as other luxury goods. In some instances, ELKOUSSA put legal title to the **Subject Properties** in the names of LLCs in ELKOUSSA's spouse, Individual B's, name, but all the **Subject Properties** were purchased with the Fraud Proceeds in transactions controlled by ELKOUSSA.

## **Background Information on COVID-19 Uninsured Program**

14. Since March 2020, several legislative acts designed to provide emergency financial assistance to the millions of Americans suffering due to the COVID-19 pandemic have been passed by Congress and signed into law.

15. In March 2020, the Families First Coronavirus Response Act ("FFCRA") provided $1 billion to the Public Health and Social Services Emergency Fund ("PHSSEF") administered by the U.S. Department of Health and Human Services ("HHS"), for reimbursement to hospitals and other health care providers ("Providers")

8

for COVID-19 related treatment and services or visits of uninsured individuals. Public Law 116-127 (Mar. 18. 2020).

16.     The FFCRA defines an uninsured individual as someone who is not enrolled in: (A) a Federal health care program (e.g., Medicare or Medicaid), including an individual who is eligible for medical assistance by reason of and during any portion of the emergency period, (B) a group health plan or health insurance coverage offered by a health insurance issuer in the group or individual market, or (C) the Federal Employees Health Benefits Program. 134 Stat. 182, Public Law 116-127 (Mar. 18, 2020).

17.     In March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act appropriated $100 billion to the PHSSEF for HHS to distribute these funds through grants or other mechanisms to reimburse "eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." The CARES Act noted the funds "may not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse."

18.     In April 2020, the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA") appropriated $1 billion to the PHSSEF "to cover the cost of testing for the uninsured."

19.     In March 2021, the American Rescue Plan Act of 2021 ("ARP") appropriated funds to HHS. According to a May 25, 2021, HHS press release, of the

ARP funds, $4.8 billion were dedicated to support the continued reimbursement to "health care providers for testing uninsured individuals for COVID-19."

20.    HRSA, an agency of HHS, oversees and administers these funds through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (the "HRSA Program"). The HRSA Program is administered by HRSA through a contract with UnitedHealth Group. HRSA established a single electronic claims processing system for health care providers to submit claims for reimbursement for diagnostic testing and treating uninsured individuals from the funds. Tests are generally reimbursed at Medicare rates.

21.    To participate in the HRSA Program, an individual authorized to attest on behalf of the Provider (the "Recipient") must attest to compliance with the Terms and Conditions for Participation in the HRSA Program ("HRSA Terms and Conditions"). Recipients must acknowledge that each time the Recipient submits a claim for reimbursement for COVID-19 testing and/or testing-related items and services provided to individuals who did not have health coverage at the time the services were provided ("Uninsured Individuals"), each claim must be in full compliance with the HRSA Terms and Conditions.

22.    The HRSA Terms and Conditions define COVID-19 Testing as an in vitro diagnostic test for the detection of SARS-COV-2 or the diagnosis of the virus that causes COVID-19, and the administration of such test, that meets certain

10

requirements, such as being approved by the FDA or authorized by the FDA for emergency use.

23. Recipients who attest to the HRSA Terms and Conditions certify that:

a. The Recipient or its agents provided the items and services on the claim form to the Uninsured Individuals identified, on or after February 4, 2020, and that all items and services for which Payment is sought were medically necessary.

b. To the best of the Recipient's knowledge, the patients identified on the claim form were Uninsured Individuals at the time the service was provided.

c. The Recipient will not use the payment from HRSA to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse.

d. The Recipient will not engage in "balance billing" or charge any type of cost sharing for any items or services provided to Uninsured Individuals receiving a COVID-19 testing and/or testing related items for which the Recipient receives a payment from the HRSA Program fund. The Recipient "shall consider Payment received from the Uninsured Program Fund to be payment in full for such COVID-19 testing and/or testing-related items."

e. The Recipient will maintain appropriate records and documentation required to substantiate payments. The Recipient will promptly submit copies of such records and documentation upon request of appropriate regulators.

24. To claim reimbursement for COVID-19 testing of Uninsured Individuals, Providers must submit patient rosters to the HRSA program portal. This can be done on an individual patient basis or in batches. To document patient eligibility, recipients must submit unique identifiable information about uninsured individuals, including the patient's name, date of birth, and gender. The HRSA Program further requires the patient's social security number and state of residence, or state identification / driver's license, in order to verify patient eligibility. If a patient's social security number, state of residence, or state identification / driver's

11

license is not submitted, the recipient must attest that they attempted to capture this information before submitting a claim and the patient did not have this information at the time of service, or that the recipient did not have direct contact with the patient and thus did not have an opportunity to attempt to capture this information.

25.     Each time a provider adds either an individual patient or a batch of patients to their patient roster, they are required to attest to the following:

    a.      They have read and agree to the applicable HRSA Terms and Conditions;

    b.      They have checked for health care coverage eligibility and confirmed the patient is uninsured, and no other payer will reimburse for COVID-19 testing or care for the patient;

    c.      They will accept the defined program reimbursement, as determined by HRSA, as payment in full and will not balance bill the patient; and

    d.      They have agreed to program terms and conditions and be subject to post-reimbursement audit review.

26.     On or about March 22, 2022, the HRSA Program stopped accepting claims for COVID-19 testing due to lack of funds.

**<u>Background on Meridian Collection Sites</u>**

27.     Meridian purportedly operated numerous COVID-19 test collection sites located in Illinois and Florida. Meridian was incorporated on or about April 22, 2020, and was registered to ELKOUSSA as Meridian's President.

28.     Meridian entered into a Laboratory Services Agreement ("LSA") with Laboratory A, effective March 24, 2021, that is signed by ELKOUSSA as President of Meridian. The LSA stated that Meridian was a business that provided health care management services to health care providers and suppliers, such as Clinical

Laboratory Improvement Amendment ("CLIA") certified laboratories,[1] and was able to provide properly licensed or certified professionals who were adequately trained to provide or assist with on-site collection services. Additionally, the LSA stated that Meridian desired to work with Laboratory A to gather specimens for testing for COVID-19 and have Laboratory A provide certain laboratory services.

29. Laboratory A utilized an electronic laboratory information system ("LIS") called Hex to track the number of tests associated with each collection site. Laboratory A assigned a collection code in Hex to each collection site that brought COVID-19 tests to Laboratory A. Laboratory A tracked each test in Hex according to its collection site code to correctly reimburse each collector for the tests affiliated with that site.

30. Meridian purported to run and operate Meridian Collection Sites located at:

a. 645 S. Central Ave, Chicago, IL ("Central Site"). The Central Site is the address of Hospital A, a hospital located on the west side of Chicago that provides medical care to low-income individuals;

b. 3240 Franklin Blvd, Chicago, IL ("Franklin Site"). The Franklin Site is the address of the former Hospital B, which closed in approximately July 2013. The Franklin Site was located in the parking lot next to the former Hospital B;

c. 5900 W. 159th St., Oak Forest, IL ("Oak Forest Site") is the

---

[1]  See https://www.cms.gov/medicare/quality/clinical-laboratory-improvement-amendments (last accessed June 19, 2025).

location of the Eagle Sports Range.[2]

       d.    4300 L.B. McLeod Rd., Unit B, Orlando, FL ("Orlando Site"),

which was the location of the Arab American Community Center; and

       e.    3201 Griffin Rd., Suite 204, Fort Lauderdale, FL, which is an

office suite ("Fort Lauderdale Site").

       31.    Laboratory A assigned a collection site code in its LIS for each of the

Meridian Collection Sites, and the following collection codes were assigned to each

Meridian Collection Site:

| Collection Site | Collection Site Code in Hex |
|---|---|
| **Central Site** | 1491A |
| **Franklin Site** | 1463A |
| **Oak Forest Site** | 1505A |
| **Orlando Site** | 1497A |
| **Fort Lauderdale Site** | 1503A |

---

[2] Previous search and seizure warrant affidavits executed in the Northern District of Illinois identified 5900 W. 158th St., Oak Forest, IL as the Oak Forest Site, based upon certain records provided by Laboratory A (*see* 24 M 153, 24 M 453, and 24 M 454). However, that address does not appear to be an actual address. Rather, 5900 W. 158th Place, Oak Forest, IL appears to be a residential apartment building complex, while 5900 W. 159th St, Oak Forest, IL (the location of the Oak Forest Site identified herein) was the location of the Eagle Sports Range. Law enforcement agents obtained evidence indicating that the Eagle Sports Range was the location of the Oak Forest Site, as detailed herein.

### The Use of Fictitious Names at the Meridian Collection Sites

32.    Law enforcement agents conducted an analysis of names and corresponding dates of birth contained in the Meridian Collection Site patient data provided by Laboratory A. Specifically, agents filtered Laboratory A data to identify tests associated with the Meridian Collection Sites and then randomized the results. Law enforcement agents then sent a list of approximately 20,000 names and dates of birth per Meridian Collection Site to the Illinois Secretary of State ("IL SOS") and the Florida Department of Highway Safety and Motor Vehicles ("FLHSMV") to determine whether those names and corresponding dates of birth yielded a match in either the IL SOS or FLHSMV systems.

33.    Below is a summary of IL SOS's and FLHSMV's responses to the names and dates of birth requested by law enforcement. Negative results indicated that the name and corresponding date of birth did not result in a match in either the IL SOS or FLHSMV system. Positive results indicated that the name and corresponding date of birth did result in a match in either the IL SOS or FLHSMV system. In total, of approximately 100,000 names and dates of birth requested by law enforcement, IL SOS and FLHSMV records showed that approximately 51 names, or approximately .05%, resulted in positive matches.

| STATE AGENCY SUBPOENAED | MERIDIAN COLLECTION SITE | RESULT | NUMBER OF NAMES | PERCENTAGE OF TOTAL |
|---|---|---|---|---|
| **FLHSMV** | Orlando/ 1497A | Negative | 19,980 | 99.90% |
| | Orlando/ | Positive | 19 | 0.10% |

| | 1497A | | | |
|---|---|---|---|---|
| **FLHSMV** | Ft. Lauderdale/ 1503A | Negative | 19,980 | 99.90% |
| | Ft. Lauderdale/ 1503A | Positive | 20 | 0.10% |
| **IL SOS** | Franklin/ 1463A | Negative | 19,996 | 99.98% |
| | Franklin/ 1463A | Positive | 4 | 0.02% |
| **IL SOS** | Central/ 1491A | Negative | 19,998 | 99.99% |
| | Central/ 1491A | Positive | 2 | 0.01% |
| **IL SOS** | Oak Forest/ 1505A | Negative | 19,994 | 99.97% |
| | Oak Forest/ 1505A | Positive | 6 | 0.03% |

## The Low Rate of Positive Results from Tests Purportedly Collected at the Meridian Collection Sites

34. According to Laboratory A records, none of the five Meridian Collection Sites associated with fictitious identities exceeded a COVID-19 positivity rate of 1%. Illinois Department of Public Health records show that, between March 2021 and March 2022, the average COVID-19 positivity rate in Cook County, Illinois was between approximately 4% and 4.5%.

35. Unlike the average Cook County COVID-19 positivity rates detailed above, the Franklin Site (1463A) sent in approximately 250,914 tests between January 2021 and March 2022 and logged approximately 236 positive tests, or a positivity rate of approximately .09%.

36.     The Central Site (1491A) sent in approximately 449,098 tests between March 2021 and March 2022, and logged approximately 282 positive tests, or a positivity rate of .06%.

37.     The Oak Forest Site (1505A) sent in approximately 77,852 tests between May 2021 and February 2022, and logged approximately 14 positive tests, or a positivity rate of .02%.

38.     The positivity rates of COVID-19 tests affiliated with the Meridian Collection Sites purportedly located in Cook County trailed the Cook County positivity rate by approximately 4%, further indicating that the patients associated with the Meridian Collection Site data were not real.

### Laboratory A Billing and Repayments to HRSA

39.     Laboratory A bank records show that HRSA paid Laboratory A approximately $207 million. An analysis of HRSA data and Laboratory A data shows that approximately $154 million of the reimbursements HRSA paid to Laboratory A were affiliated with the Meridian Collection Sites. Laboratory A deposited approximately $60.3 million into Meridian's bank account at Financial Institution A ending 2268 ("Meridian Account 1") between approximately April 6, 2021, and March 3, 2022.

40.     On or about February 23, 2022, Laboratory A sent a repayment check to HRSA totaling approximately $688,000. On or about March 12, 2022, Laboratory A sent a repayment check to HRSA totaling approximately $2,460,000. On or about May 4, 2022, Laboratory A repaid HRSA approximately $246,920. On or about

February 27, 2023, Laboratory A made a repayment to HRSA totaling approximately $41.1 million.[3]

41. In a letter addressed to HRSA dated February 27, 2023, counsel for Laboratory A wrote: "[t]o complete the voluntary overpayment process we began in February 2022, we have been able to quantify the instances in which we could not correlate claims submitted with Covid-19 specimens. As previously discussed, this seems to be limited to interactions with one of the specific companies with which we worked [.]" The letter did not identify the name of the referenced collection company; however, attached to the letter, Laboratory A included a spreadsheet that contained a list of all the test data from October 2021 for which Laboratory A was reimbursing HRSA, which included Meridian tests billed between October 2021 and February 2022.

42. According to Laboratory A records, Meridian's only contract with Laboratory A related to COVID-19 testing. As noted above, Laboratory A paid Meridian approximately $60.3 million in HRSA funds between April 2021 and March 2022.

**Mass Deletion of Meridian Collection Site Email Addresses**

43. Laboratory A used Testing Request Forms that contained biographical information for each patient. For example, each form contained a patient's name, date of birth, address, phone number, sex, and insurance information. The forms also contained an email account, and each of the Meridian Collection Sites were affiliated

---

[3] The Laboratory A repayment checks were made out to United Healthcare, which administered the HRSA Uninsured Program.

with one or more email addresses listed below. Laboratory A records show that Laboratory A often sent COVID-19 test results to the Google email address associated with the corresponding collection sites, rather than to an email address affiliated with the specific patient. Below are the email addresses associated with each collection site ("Collection Site Email Addresses"):

| Collection Site | Collection Site Code in Hex | Associated Email Address in Hex |
|---|---|---|
| **Central Site** | 1491A | covidloretto21@gmail.com and covidsitechi1@gmail.com |
| **Franklin Site** | 1463A | covidtent1@gmail.com |
| **Oak Forest Site** | 1505A | covidsiteofo@gmail.com |
| **Orlando Site** | 1497A | covidtesting23@gmail.com |
| **Fort Lauderdale Site** | 1503A | covidsitemia@gmail.com |

44. All six of the Meridian Collection Site Email Addresses referenced above were created between January 2021 and July 2021. All of these email accounts were either deleted or had an end-of-service date of February 17, 2022. Three of the six email accounts were deleted within 10 minutes of each other on February 17, 2022.

45. On June 23, 2025, a federal grand jury in Northern District of Illinois charged ELKOUSSA with five counts of wire fraud for his involvement in the scheme described above. *See United States v. Elkoussa*, Case No. 1:25CR330 (N.D. Ill.).

**ELKOUSSA Used the Fraud Proceeds to Purchase
the Subject Properties**

46.     After receiving over $60.3 million in Fraud Proceeds into Meridian Account 1, ELKOUSSA transferred nearly $22 million in Fraud Proceeds to an entity that he controlled called Aventus Holdings and Investments Corp. ("Aventus").

47.     Between approximately March 2021 and March 2022, Meridian Account 1 received approximately $64.3 million in deposits.  Of that amount, Laboratory A paid Meridian Account 1 approximately $60.3 million between March 2021 and March 2022, or approximately 94% of total inflows into Meridian Account 1. ELKOUSSA was listed as President on the signature card and was the sole signatory on Meridian Account 1 from May 24, 2021, until the account closed in or around February 2023. Until May 24, 2021, ELKOUSSA was a co-signatory on Meridian Account 1 with Individual A.

48.     ELKOUSSA also maintained an account at Financial Institution A ending in 8652 in the name of Aventus Holdings and Investments Corp. ("Aventus Account"). The Aventus Account was opened on or about August 25, 2021. ELKOUSSA was listed as President on the Aventus Account's signature card and was a signatory on the account. ELKOUSSA's spouse, Individual B, was listed as Secretary and was also a signatory on the Aventus Account. Individual C was added as a signer on the Aventus Account in or around December 2021.

49.     Between August 2021 and March 2022, over $21.9 million was transferred from Meridian Account 1 to the Aventus Account. The $21.9 million

received from Meridian Account 1 was substantially the only source of income in the Aventus Account. The total income for the Aventus Account, between August 2021 and March 2022, was $22 million, with $21.9 million from Meridian Account 1. The remaining amount of approximately $100,000 came from refunds and rental income on the commercial properties below, specifically the **South Holland Property**. Therefore, all the funds in the Aventus Account used to purchase the **Subject Properties** came from Fraud Proceeds in Meridian Account 1.

### ELKOUSSA's Use of Fraud Proceeds to Purchase the Burr Ridge Properties

50.     In October 2021, ELKOUSSA used the Fraud Proceeds to purchase the **Burr Ridge Properties**. ELKOUSSA purchased this property through an entity called Emily Investments LLC, which was the account holder on an account entirely funded with Fraud Proceeds by the Aventus Account.

51.     More specifically, on or about October 21, 2021, a wire for $2.4 million was sent from the Aventus Account to the Financial Institution A account ending in 1539, held in the name of Emily Investments LLC ("the Emily Account"). According to Financial Institution A records for the Emily Account, the account was opened on or about October 6, 2021, by ELKOUSSA and Individual B. The primary identification used for account opening was the Articles of Incorporation for Emily Investments LLC, which was incorporated in the State of Delaware on October 1, 2021. Individual B and ELKOUSSA are the only signatories on the Emily Account.

52.     On or about October 27, 2021, two wires totaling $2.6 million were sent from the Emily Account to Chicago Title and Trust. The purchase of the **Burr Ridge**

**Properties** was paid for with the two wires from the Emily Account on October 27, 2021, for a total of $2.6 million.

53.     Aside from the $2.4 million wire on October 21, 2021, the only other activity in the Emily Account prior to the wire on October 27, 2021, was a $300,000 cash deposit made upon opening the account on or about October 6, 2021. On the same day, $300,000 cash was withdrawn from the Aventus Account.

| Count | Date | Wire Amount | Wire Reference |
|---|---|---|---|
| **1** | 10/27/2021 | $1,600,000.00 | 21023412Lp-102 Ashton Drive, Burr Ridge & 9000 County Line Road, Burr Ridge |
| **2** | 10/27/2021 | $1,000,000.00 | 21025047Lp-80 Ashton Drive, Burr Ridge, IL |
| | **Total** | **$2,600,000.00** | |

54.     Per Chicago Title and Trust records, on or about October 27, 2021, Emily Investments LLC purchased the **Burr Ridge Properties**.

55.     The sale was divided into two files, denoted as follows: 21025047LP, in reference to **Burr Ridge Property 1**, and 21023412LP, in reference to **Burr Ridge Property 2** and **Burr Ridge Property 3**. The wire for $1,000,000 went toward file 21025047LP, and the $1,600,000 wire went toward file 21023412LP.

56.     On October 27, 2021, ELKOUSSA exchanged several emails with the relevant parties for the close of the **Burr Ridge Properties** purchase, with email subject line: "80 Ashton and 102 Ashton, Burr Ridge."

## ELKOUSSA's Use of Fraud Proceeds to Purchase the Homer Glen Property

57.     In October 2021, on the same date as the purchase of the **Burr Ridge Properties**, ELKOUSSA used the Fraud Proceeds to purchase the **Homer Glen**

**Property**. ELKOUSSA purchased this property in the name of Kenzie Investments LLC, and the purchase was entirely funded with Fraud Proceeds by the Aventus Account.

58.     More specifically, Kenzie Investments LLC was incorporated in the State of Delaware on October 1, 2021. Financial Institution A bank account ending in 3186 in the name of Kenzie Investments LLC (the "Kenzie Account"), was opened on or about October 6, 2021, by Individual B and ELKOUSSA. Individual B and ELKOUSSA are the only signatories on the account.

59.     On or about October 21, 2021, a wire for $530,000 was sent from the Aventus Account to the Kenzie Account. There were no other funds in the Kenzie Account between account opening and the $530,000 received from the Aventus Account on October 21, 2021.

60.     On or about October 29, 2021, a wire for $510,000 was sent from the Kenzie Account to Independent Escrow Services Corp ("Independent Escrow"). The reference on the wire transfer was:

KENZIE INVESTMENTS, LLC REFERENCE NO: 19411162 PROPERTY ADDRESS: 16006 DONNA MARIE DRIVE, HOMER GLEN IL WILL 60491.

61.     ELKOUSSA purchased the **Homer Glen Property**, which was real estate located at 16006 Donna Marie Drive, Homer Glen, IL 60491, with a closing date of October 29, 2021. The purchase was paid for with the $510,000 wire from the Kenzie Account on October 29, 2021.

62.    The Real Estate Contract for the **Homer Glen Property** listed the buyer as "Jamil Elkoussa Aventus Holding and Investments Corp." ELKOUSSA's initials and signature are denoted throughout the contract confirming acceptance.

### ELKOUSSA's Use of Fraud Proceeds to Purchase the South Holland Property

63.    In December 2021, ELKOUSSA used Fraud Proceeds from the Aventus Account to purchase the **South Holland Property**. The purchase was paid for via three wires from the Aventus Account for $25,000, $500,000, and $200,000 on December 10, 29, and 30, 2021, respectively.

64.    More specifically, Aventus Holdings and Investments Corp. purchased the **South Holland Property**, commercial real estate at 629-645 E 162nd Street, South Holland, IL 60473, on or about December 31, 2021.

65.    The purchase was paid for with the three wires from the Aventus Account for $25,000, $500,000, and $200,000 on December 10, 29, and 30, 2021, respectively. Financial Institution A records for the Aventus Account show those three wires, which totaled $725,000.

| Count | Date | Wire Amount | Wire Reference |
|---|---|---|---|
| 1 | 12/10/2021 | $25,000.00 | Aventus Investments And Holding Corp, 629 E 162ND Street, South Holland, IL 60473, 56309798-Bnf-Aventus Investments And Holding Corp, Escrow Money |
| 2 | 12/29/2021 | $500,000.00 | Aventus Investments And Holding Corp 629 E 162ND St File 21 Bar55594 |
| 3 | 12/30/2021 | $200,000.00 | Aventus Investments And Holding Corp 629 E 162ND St File 21 Bar55594 |
| | **Total** | **$725,000.00** | |

66.     The documentation provided by the Barrister Title Company, which executed the sale of the **South Holland Property**, includes a Special or Limited Durable Power of Attorney authorization signed by ELKOUSSA for this transaction. The POA appoints J.J.M., Attorney at Law, to act on behalf of "Aventus Holdings and Investment Corp., by Jamil Elkoussa, President and Authorized Agent." The POA is signed by ELKOUSSA and notarized in the state of Illinois.

67.     According to Network Property Management records, Network Property Management ("Network") entered into a management agreement with Individual B to manage the **South Holland Property** in or around July 12, 2022. ELKOUSSA is the point of contact for business decisions regarding the **South Holland Property**.

68.     In March 2024, Individual B authorized Network Commercial Real Estate, LLC, to sell the **South Holland Property** on behalf of Aventus Holdings and Investments Corp.

### ELKOUSSA's Use of Fraud Proceeds to Purchase the Miami Property

69.     In March 2022, ELKOUSSA bought a luxury house at 2140 South Miami Avenue, Miami, FL 33127 ("the **Miami Property**"), with approximately $5 million in Fraud Proceeds from the Aventus Account. ELKOUSSA purchased the **Miami Property** in the name of an LLC that he created (Luxe Rentals & Investments LLC) and funded the transaction by transferring approximately $5 million from the Aventus Account to a law firm that he hired for the transaction.

70.     More specifically, in or about March 2022, approximately nine wires were sent from the Aventus Account to an account in the name of Law Firm A, ending

in 9104 (the "Law Firm A Account"),[4] for a total of approximately $4,988,911. The transfers are listed below:

| Transaction | Date | Wire Amount | Wire Reference, if any: |
|---|---|---|---|
| 1 | 3/7/2022 | $500,000.00 | Escrow Funds for 2140 Miami |
| 2 | 3/8/2022 | $500,000.00 | Miami 2140 |
| 3 | 3/9/2022 | $500,000.00 | Miami 2140 |
| 4 | 3/10/2022 | $500,000.00 | Miami 2140 investment |
| 5 | 3/11/2022 | $500,000.00 | |
| 6 | 3/14/2022 | $500,000.00 | Miami 2140 Investment |
| 7 | 3/15/2022 | $500,000.00 | 2140 Investment |
| 8 | 3/16/2022 | $500,000.00 | 2140 |
| 9 | 3/17/2022 | $988,910.51 | 2140 |
| | Total | $4,988,910.51 | |

71.    Law Firm A Account's funds were received in March 2022 from the Aventus Account, as set forth above, and the funds were then used to purchase the **Miami Property**.[5] The **Miami Property** was sold from 2140 S Miami Ave LLC to Luxe Rentals & Investments LLC ("Luxe") for $5,000,000, with a closing date of March 18, 2022.  After the deductions and credits, including the $500,000 in escrow funds noted in Transaction 1 above, the total amount owed from Luxe in the **Miami Property's** HUD-1 & Settlement Statement was $4,488,910.51, which corresponds to Transactions 2 through 9 in March 2022 from the Aventus Account. The Settlement Statement shows a signature of Individual B on behalf of Luxe, listing her title as

---

[4] According to records provided by City National Bank of Florida, the Law Firm A Account ending in 9104 was held in the name of Law Firm A. Opening documentation for the account provided the nature of business as "legal firm" and the account purpose was listed as "Iota Trust, Escrow Deposits."

[5] All payments related to this transaction reference "2140," "Luxe pf 2140," or "22-106." According to Law Firm A records, the reference number for this transaction was designated as 22-106 Individual B. This reference number is listed on documentation throughout the records provided.

"manager." According to Miami-Dade County public records, the warranty deed of the **Miami Property** passed to Luxe on or about March 18, 2022.

72.     Based on the following, I believe that Luxe was created by ELKOUSSA in order to purchase the **Miami Property** with the Fraud Proceeds:

a)     According to the State of Delaware Division of Corporations, Luxe Rentals & Investments LLC was incorporated in Delaware on March 8, 2022, with Harvard Business Services, Inc. ("Harvard") listed as the registered agent.

b)     According to customer and transaction documentation provided by Harvard, the business address of ELKOUSSA's accountant is the communications, billing, and mail forwarding address for Luxe. According to Harvard's notes and customer records, on March 8, 2022, Luxe was created and incorporated with ELKOUSSA listed as the registered agent.

c)     According to documentation provided by Law Firm A, the Property Inspection Report for the **Miami Property**, prepared by American Veterans Home Inspections on March 10, 2022, states "Inspection prepared for: Jamil Elkoussa" on the face of the report.

73.     ELKOUSSA was the primary point of contact for the real estate agent who listed the **Miami Property**.

74.     The **Miami Property** sold for $5,250,000 on May 16, 2024. For the 2024 closing, Law Firm B was given instructions to wire the **Miami Funds** in the amount of $4,860,765.02 to Financial Institution C in Beirut, Lebanon, to an account in the

name of Individual B. Law Firm B followed these instructions and wired the money to Financial Institution C on May 16, 2024.

75.     On or about May 22, 2024, Law Firm B initiated a wire recall of this May 16, 2024, wire of the **Miami Funds**. On or about June 3, 2024, Financial Institution C wired the **Miami Funds** through an intermediary U.S. account, which then transferred the **Miami Funds** to the trust account held by Law Firm B on or about June 5, 2024.

76.     On June 7, 2024, pursuant to a seizure warrant issued in the Northern District of Illinois,[6] the **Miami Funds**, in the amount of $4,860,610.02, were seized. The **Miami Funds** are in the custody of the United States Marshals Service.

**ELKOUSSA's Use of Fraud Proceeds to Purchase<br>the Alsip Property**

77.     In April 2022, the month after the **Miami Property** purchase, ELKOUSSA purchased the **Alsip Property**, which is commercial real estate in Alsip, Illinois. The purchase was paid for with two wires from the Aventus Account for $500,000 and $24,823 on April 11 and 14, 2022, respectively.

78.     ELKOUSSA created an LLC to be the purchaser of record for the property with Individual B listed as the sole LLC member. Specifically, according to records provided by Harvard, Alsip Rental was incorporated in Delaware on March 15, 2022, with ELKOUSSA listed as the billing contact for this transaction. Individual B is also listed as a member of Alsip Rental. Additionally, ELKOUSSA is

---

[6] *See* 24 M 453 (Hon. Keri L. Holleb Hotaling).

listed as the registered agent and dr.jamilelkoussa@gmail.com is the email contact for Alsip Rental.[7]

79.     According to Financial Institution A records for the Aventus Account, in or around April 2022, two wires were sent to "Janus Title Agency LLC" for a total of $524,823.09.

| Count | Date | Wire Amount | Wire Reference |
|-------|------|-------------|----------------|
| 1 | 4/11/2022 | $500,000.00 | Alsip Rental Investments LLC Jt-22-2305 And 5152-60 W 127th St |
| 2 | 4/14/2022 | $24,823.09 | |
| | **Total** | **$524,823.09** | |

80.     The Real Estate Sale Contract for the **Alsip Property** was mutually signed by Alsip Rental (purchaser) and Discovery Investments & Acquisitions LLC (seller) on or about April 13, 2022.

81.     According to Network, the property manager of the **Alsip Property** prepared a Property Management Proposal for ELKOUSSA, dated April 21, 2022. The proposal states: "Jamil, Thank you for contacting us regarding the management of your property in Alsip." The final Management Agreement, between Alsip Rental and Network, beginning May 1, 2022, was signed on April 24, 2022, by Individual B as President/Owner of Alsip Rental.

82.     According to Network, the property management company was in regular contact with ELKOUSSA regarding management of the **Alsip Property** via

---

[7] Subscriber records obtained from Google indicate that this email account is subscribed to ELKOUSSA.

phone calls and text messages. The property management company was paid $20,000 via wire from the Aventus Account on or about June 21, 2022.

**ELKOUSSA Used Fraud Proceeds to Purchase
the Michigan City Property**

83.     Shortly after the purchase of the **Alsip Property**, ELKOUSSA purchased commercial real estate located at 625 East US Highway 20, Michigan City, IN 46360 in April 2022 (the "**Michigan City Property**"). After signing the initial purchase agreement in January 2022 as the buyer in his personal capacity, ELKOUSSA formed JH Indiana Development LLC ("JH Indiana") as the purchasing entity and paid for the property with Fraud Proceeds from the Aventus Account.

84.     The **Michigan City Property** Purchase Agreement, dated January 5, 2022, was signed on January 6, 2022, with ELKOUSSA listed as the buyer in his personal capacity.

85.     State of Delaware Division of Corporations records show that, on January 18, 2022, JH Indiana was incorporated in Delaware. On July 17, 2023, ELKOUSSA engaged Harvard to act as the registered agent for JH Indiana. On July 18, 2023, Individual D recorded Harvard as the registered agent of JH Indiana on record with the State of Delaware Division of Corporations. According to Harvard records, ELKOUSSA was the sole customer, communications, and billing contact for JH Indiana.

86.     According to records provided by Meridian Title, JH Indiana is listed as the purchaser of the **Michigan City Property**, while ELKOUSSA's signature is on the settlement statement and on closing documentation throughout, in which he is

listed as "member" of JH Indiana. The purchase was paid for with two wires from the Aventus Account for $260,262 and $240,262 on April 21, 2022, and April 22, 2022, respectively, for a total of $500,524.

| Count | Date | Wire Amount | Wire Reference |
|---|---|---|---|
| **1** | 4/21/2022 | $260,262.00 | File 221745 625 East US Highway 20 Michigan City IN 46360 |
| **2** | 4/22/2022 | $240,262.00 | File 22 1745 625 East US Highway 20, Michigan City IN 46360 |
| | **Total** | **$500,524.00** | |

87.    According to Network, Network was engaged to manage the **Michigan City Property** in or around June 2022. The Management Agreement, beginning June 1, 2022, was signed by Individual B on July 12, 2022, but ELKOUSSA and Individual D are the two points of contact for the **Michigan City Property**. According to Financial Institution A, ELKOUSSA opened an account ending in 5888 at Financial Institution A under the name "JH INDIANA DEVELOPMENT LLC" on or about May 4, 2022. ELKOUSSA is the sole signatory on the account and listed as "member."

88.    Per records provided by Network, ELKOUSSA was in contact with J.B. regarding management of the **Michigan City Property** via phone calls and text messages. Per Financial Institution A records for the Aventus Account, two wires for $10,000 each were sent to Network on or about June 21, 2022.

89.    In February 2023, ELKOUSSA and Individual D authorized Network Commercial Real Estate, LLC, to sell the **Michigan City Property** on behalf of JH Indiana. JH Indiana entered into a Purchase and Sale Agreement ("PSA") as of

August 28, 2023. The PSA is between JH Indiana (the Seller) and Michigan City Trust No. 1 (the Buyer). The **Michigan City Property** sold on approximately July 10, 2024.

90.     On July 9, 2024, a seizure warrant was issued by the Northern District of Illinois to seize the **Michigan City Funds** related to the **Michigan City Property**, in an amount not to exceed $1,570,495.79.[8]  On July 10, 2024, pursuant to the seizure warrant, the **Michigan City Funds**, in the amount of $1,204,810.98 were seized and placed into custody of the United States Marshals Service.

### Conclusion

91.     For the reasons stated herein, the foregoing defendant properties:

b. constitute and are derived from proceeds traceable to violations of Title 18, United States Code, Section 1343 (wire fraud), and therefore are subject to forfeiture and condemnation pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 981(a)(1)(C); and

b. were involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957 (money laundering), and are property traceable to such property.

WHEREFORE, based upon the aforementioned facts and circumstances, , Plaintiff, United States of America, by and through its undersigned counsel, respectfully, prays:

---

[8] *See* 24 M 454 (Hon. Keri L. Holleb Hotaling).

1) That the defendant real properties be proceeded against for forfeiture and condemnation;

2) That process issue for an arrest warrant *in rem* for the defendant funds in the amounts of $4,860,610.02 and $1,204,810.98, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

3) That due notice be given to all parties to appear and show cause why forfeiture of the defendant properties to the United States in accordance with the claims herein set forth should not be decreed;

4) That this Court enter a judgment of forfeiture for the defendant properties to the United States; and

5) That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

LORINDA LARYEA
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By: *Claire T. Sobczak*
CLAIRE T. SOBCZAK
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(202) 591-5418

KELLY GUZMAN
Assistant U.S. Attorney

Dated:    September 23, 2025

NORTHERN DISTRICT OF ILLINOIS )
                                          )     SS

COUNTY OF COOK                     )

<u>AFFIDAVIT</u>

I, **MELISSA BAYAN**, being duly sworn, upon oath, deposes and states as follows:

1.      I am a Special Agent with the Health and Human Services Office of the Inspector General ("HHS-OIG"). I have been so employed since approximately June 2023. I was previously a Special Agent with the Federal Bureau of Investigation ("FBI") from January 2008 to June 2023. My duties and responsibilities as a Special Agent with HHS-OIG include the investigation of health care fraud and related white-collar crimes. I have received specialized training in conducting health care and related fraud investigations and have helped participate in numerous health care fraud investigations.

2.      I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents. The complaint does not include each and every fact known to me concerning this investigation.

3.    I declare under penalty of perjury under the laws of the United States

of America that the foregoing is true and correct to my own knowledge and belief.

Dated: ___9/22/2025_____                    *Melissa Bayan*
                                          _____
                                          **MELISSA BAYAN**
                                          Special Agent
                                          U.S. Department of Health and Human
                                          Services, Office of the Inspector General